[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case arises out of a real estate transaction wherein the plaintiffs on or about August 26, 1994, purchased at a closing the residential property at 29 Red Barn Lane in Trumbull, Connecticut, from the defendants for a purchase price of $312,000. The issue in this case revolves around paragraph A.3 of a Rider to Contract attached to the Contract of Sale (ex. F) executed by all parties to this suit on or about August 17, 1994. That paragraph insofar as it is applicable to this case reads as follows:
 "If the premises being sold are served by a septic tank and/or leeching field, to the best of Seller's knowledge, information and belief, the septic tank and leeching fields serving the premises . . . and the subject premises is at the present time in good repair and good working order. Seller further represents to Buyer that the septic system has not required any repairs other than general cleaning within the past eighteen (18) months Seller represents that Seller has at no time experienced effluent coming to grade from the system."
By way of background, the defendants had occupied the house since it was built in 1971. They lived there with their four children, all of whom had moved prior to the time of closing. The home had five bedrooms and was serviced by two and a half baths. Mr. Mann was a licensed engineer specializing in electrical engineering. He acted as the general contractor in the house construction and personally designed the septic system. He identified both his originally proposed plan and the final modified plan after consultation with the appropriate officials CT Page 9201 in the Town of Trumbull (see plaintiff's ex. H I). The system which was designed for and installed in the front yard consisted of a 1500 gallon septic tank and two runs of concrete galleys, 4' x 4' x 4', one extending 56 feet long and the other 48 feet long for a total of 26 galleys. The town also required the installation of a curtain drain because of underground water.
There is no evidence of any problems with the septic system before April 22 of 1991. On that date, the septic tank and galleys were pumped by Amherst Septic Company by its owner William Kern who testified that he pumped 4000 gallons from the system on that occasion, 1500 from the tank and the rest from the galleys. He indicated he noticed water leaking from the last galley near the driveway and running down the driveway which he called to Mr. Mann's attention. He described this situation as a breakout from the system. He advised Mr. Mann that it was a sign of a problem and he recommended that Mann contact Monroe Septic because that company was in the business of installing and repairing septic systems which he was not. He gave Mr. Mann a bill for $345.00 (plaintiff's ex. A) which contains a note, "Reminder card three years" which, based on other testimony, designates the estimated length of time when the tank should be pumped again unless there was a problem. Mr. Mann, in his testimony, admitted that Kern had alerted him to a problem with the septic system on that occasion and that they were together on that occasion to observe a fluid coming from the ground over the last galley that then ran down the driveway. Mann described water coming through fissures in the asphalt driveway which covered part of the galleys. Mann testified that he felt Mr. Kern had some vested interest with Monroe Septic and he questioned Mr. Kern's motivation. He further testified that the water coming to surface appeared clear, lacked an odor and was associated usually with the incidence of rain. He did not call Monroe Septic or anyone else.
On January 28, 1992, some nine months later, Mann summoned Amherst back to his premises and the septic tank was cleaned again. Kern again advised Mr. Mann of a continuing problem with his septic system and again recommended that he contact Monroe Septic. Apparently the leakage and water running down the driveway continued. Mr. Mann did not call Monroe Septic or anyone else.
Amherst Septic returned to the Mann property again on April 9, 1994, and pumped. the tank out again. Kern testified that some CT Page 9202 water was coming back from the galleys into the septic tank which was indicative of a problem.
Mr. Mann testified he was generally aware of the provisions of the contract concerning his representations concerning the septic system and he felt he had not violated the provisions within the Rider Sec. A.3. When pressed further, he admitted that there could have been a problem with the septic system at the time he made that representation but he "dropped it" when he heard the plaintiffs were going to have a home inspection performed.
The court finds that Mr. Mann, who was a licensed engineer, who designed the very system at issue, which system had been pumped out three times within the last three years and who knew for at least three years before signing the contract of sale with the attached rider that his system had a problem and was leaking and who was urged to contact professional help, was well aware of the fact that his septic system was not in good repair and working order and was aware of effluent coming to grade from the septic system. Whether that conclusion is sufficient to meet the plaintiffs' burden of proof will be discussed subsequently.
The plaintiffs had never owned a house with a septic system and were very concerned about the condition of the system. Mr. Ronchi made the realtor, Mr. Fred Salvati, aware of this and asked him to call Mr. Mann about the system, which he did in Mr. Ronchi's presence.
The plaintiffs occupied the premises immediately after the closing as they had to put their children into school. Soon after, they became aware of the water coming to surface next to the driveway and running down the driveway. Mr. Ronchi testified that the liquid did in fact have a septic odor. On or about October 18, 1994, Mrs. Ronchi called Monroe Septic concerning the problem and Mr. Kellogg of that company came out to the premises. Mr. Kellogg noticed the water running down the driveway, and he came back on November 15, 1994, to dig test holes. The results of that digging are contained in a letter dated December 15, 1994 (plaintiff's ex. KK) from Monroe Septic to the plaintiff. The most significant findings he made are:
1. The existing galley system is totally full of liquids at this time and when water is used at the house the effluent overflows onto the driveway on the right side of the house; CT Page 9203
2. A review of the record of pumping down by Amherst confirms that there has been a problem with the existing septic system for years; and,
3. he [Kellogg] sees no possibility of placing an acceptable system in the front yard, but the new system must go in the backyard.
The condition of the system was confirmed by the Town of Trumbull when on December 7, 1994, its sanitarian was on the plaintiff's premises when a soil test was done, and she confirmed that septic failure effluent was running towards the road and it was apparent this failure had been in progress for several months (plaintiff's ex. NN). She recommended that an engineer be hired.
Mr. Ronchi testified that he wanted to accomplish the repair in the front yard, if possible, because he believed it would be less expensive but was always advised against it. He had the tank cleaned again in November of 1994 by Kaiser Battistone at a cost of $282.00. In the spring of 1996, Ronchi hired Ralph Gallagher, a licensed engineer with a specialty in soil surface septic systems, to review his situation on sight. Gallagher confirmed that any new septic would have to be built in the backyard because of soil conditions and the water table in the front yard. Gallagher drew up a plan (plaintiff's ex. ii) for the repair in the rear which initially required the removal of top soil and the removal of several trees before the work could be commenced. Ronchi indicated he contacted other engineers, including Spath 
Bjorklund who confirmed that the repair would have to be completed in the backyard.
The defense did call its own expert, Richard Haas, also a licensed engineer, who testified that the repair could have been accomplished in the front yard at a ball park estimate of $11,000. The problem with his opinion was that its foundation lacked a sufficient history of the problem or of the soil conditions and he would never guarantee his solution. He reviewed the Gallagher plan and found it to be satisfactory, but he claimed his was cheaper.
Prior to the new system being built, Monroe Septic came back to the plaintiff's property in 1995 and dug out a swale in the backyard at a cost of $1700 in an effort to divert ground water coming from the back of the property to the front yard which was CT Page 9204 lower. That work did nothing to correct the problem, as was hoped.
Mr. Ronchi gave the Gallagher plan to several contractors and he accepted the proposal of Monroe Septic and Mr. Kellogg. The work was completed in the fall of 1996, and the total paid to that company including test holes, swale and new system amounted to $21,112, which was paid.
As part of the new installation, the original tank and galleys had to be pumped again by Amherst Septic Service at a cost of $805 and an electrical line and circuit box for the pump chamber motor was installed by Electrical Services Unlimited for $750. The plaintiffs also paid Silver Maple Tree Service $2800 for services in preparing the backyard for the septic system installation. Mr. Gallagher was paid $2150 for his services. The landscaping to return the backyard to a reasonable condition was paid to Demars Landscaping and the cost for their services amounted to $11,375.00. There was a permit fee also paid to the Town of Trumbull in the amount of $50.00.
In their post trial brief, the defendants rely on two problems with the contract of sale, plaintiff's exhibit F, which were not mentioned at the trial and were never pleaded as Special Defenses. Despite that, the court will entertain them. The defendants now claim that the Rider attached to the contract and in particular section A-3 are not part of the contract because they were not expressly made a part of the contract within the language of the contract. This claim is without any merit. Clearly, the plaintiffs' attorney's letter to Attorney Chittick (see plaintiff's exhibit E) makes reference to the contract and rider signed by the plaintiffs which "are being forwarded." Those contracts with the attached Rider were then sent by Attorney Chittick to his clients on the next day, August 18, 1994, for their execution, which was in fact accomplished. A handwritten note by Attorney Chittick on page two of his letter to his client (plaintiff's exhibit G) makes reference to paragraph A-3 of the Rider. The court concludes that the Rider was a part of the contract and was attached to it when the contract was executed by both the plaintiffs and the defendants.
The defendants next urge that a paragraph of the contract at the bottom of page three entitled "Conditions of Premises", which generally states that the plaintiffs were not induced to make their purchase decision by any representations made to them by CT Page 9205 the defendants, somehow absolves them from any liability here. They cite the case of Gibson v. Capano, 241 Conn. 725, 732 (1992) as authority for that position. That case is distinguishable from this case significantly because while in Gibson there was a clause similar to the "Conditions of Premises" clause as exists in this case, there was no rider to the contract wherein specific representations were made which became a part of the contract. To the extent there were any conflicts between the "boiler plate" section of the contract concerning representations and the specific warranties contained in the Rider, the court concludes that the terms of the Rider would prevail.
In a case such as this the plaintiffs must prove four elements: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury. Miller v. Appleby, 183 Conn. 51 at pages 54-55 (1981). The court went on to say that fraud could not be presumed but must be proven by clear and satisfactory evidence, that fraud is an issue of fact and that the trier is the judge of the credibility of the testimony and the weight to be accorded it.
This court finds all of the essential elements of fraud to have been proven. This was Mr. Mann's system, he designed it and he knew it was in trouble when he made those representations. His excuses, first that he felt Mr. Kern at Amherst Septic had some ulterior motive for recommending that Monroe Septic investigate the matter and second that despite his concern about the system, it would somehow be picked up in the buyer's home inspection, are simply lacking in credibility. On that basis, judgment will enter for the plaintiffs against the defendants.
The measure of damages for fraud is actual pecuniary loss sustained. The court concludes that the plaintiffs did everything possible to repair the system at a lower cost, but those solutions simply would not correct the problem. The loss they sustained to put the system in the back yard, prepare their property for it and return the property to its original condition were all measurable and necessary expenses caused by the defendants' misrepresentations. The court finds the specific items of damage to be as follows:
Kaiser Battistone $ 282.00 Clean tank Amherst Septic 805.00 Clean tank CT Page 9206 Monroe Septic 300.00 Dig test holes Monroe Septic 1,700.00 Dig swale Monroe Septic 18,762.00 Install new system Monroe Septic 350.00 Dig test holes R. J. Gallagher 2,150.00 Engineering services Electrical Services 750.00 Wiring septic pump Silver Maple Tree Service 2,800.00 Tree removal on this job Demars, LLC 11,375.00 Lawn installation Town of Trumbull 50.00 Permit fee
TOTAL $39,324.00
Judgment may, therefore, enter for the plaintiffs in the amount of $39,324 plus the costs of this suit, those costs to include a witness fee for R. J. Gallagher in the amount of $300.00 and a witness fee of $420.00 for Richard Kellogg, both experts called to testify by the plaintiffs.
GORMLEY, J.